O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|---|---|---|---|

| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* |
|---|---|

| Present: The Honorable | A. HOWARD MATZ, U.S. DISTRICT JUDGE |
|---|---|

| Stephen Montes | Not Reported | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys **NOT** Present for Plaintiffs: | Attorneys **NOT** Present for Defendants: |
|---|---|

**Proceedings:**        IN CHAMBERS (No Proceedings Held)

## I.    INTRODUCTION

This matter comes before the Court on the motion of Nicole Mouren-Laurens, as administrator of the Estate of Emma Mouren-Lourens, for partial summary judgment on Rev 973, LLC's claims for continuing private nuisance, continuing public nuisance, and continuing trespass (the eighteenth, nineteenth, and twentieth claims in Rev 973's Fifth Amended Complaint).  The parties are familiar with the allegations and history of this case.  The Court will not recite them in detail.

Among the many claims in this action, Rev 973 alleges that prior to its acquiring ownership of the Mouren-Laurens Property (the "ML Property"), the Mouren-Laurens Defendants operated a used oil business on the Site and in the process released hazardous petroleum-related waste, thereby causing environmental contamination.[1]  In the eighteenth through twentieth claims for relief, Rev 973 asserts the doctrines of continuing nuisance and continuing trespass as a basis to hold the Mouren-Lauren Defendants liable for the contamination.  In this motion, the Estate of Emma Mouren-Laurens ("Estate") seeks judgment in its favor on these claims on the ground that Rev 973 consented to the previous contamination because it had knowledge of it.  Rev 973 opposes the motion,

---

[1]The Mouren-Lauren Defendants are the Estate of Joseph Mouren-Laurens, Sr., the Estate of Emma Mouren-Laurens, John Mouren-Laurens, Mireille Mouren-Laurens, and Mouren-Laurens Oil Company.  The Mouren-Laurens Property is the real property and improvements located at 641, 705, 715, and 719 E. Compton Blvd. in Los Angeles.  Fifth Amended Complaint ¶¶ 30-31; Statement of Uncontroverted Facts ¶ 1.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

arguing that it did not consent to the contamination, that the consent doctrine does not apply to foreclosing lenders such as itself and that if the doctrine were to apply then it would be preempted by contrary federal policy.

As explained fully below, the Estate has not even argued, much less established, that it is beyond factual dispute that its use of the Mouren-Laurens Property was lawful and also beyond dispute that Rev 973 had full knowledge of the entire extent of the contamination.  Given that in fact there are such disputes, Rev 973 cannot be found to have consented to the contamination under the cases the Estate cites.  Accordingly, the Estate has not met its burden for summary judgment on the nuisance and trespass claims, and the motion is DENIED.[2]

## II.    FACTUAL BACKGROUND[3]

### A.    The FDIC Bid Process and Jerrold Fine's Calculations for His Bid on the Mouren-Laurens Loan

In 1979, Joseph Mouren-Laurens, Sr. and Emma Mouren-Laurens granted their ownership in the Mouren-Laurens Property to John Mouren-Laurens and Mireille Mouren-Laurens.  In 1984, John and Mireille received a loan (the "ML Loan") from Gibraltar Savings and Loan, secured with a deed of trust against the Property.  Statement of Uncontroverted Facts ("SUF") ¶¶ 1-2.

After Gibraltar Savings and Loan failed, the Federal Deposit Insurance Corporation ("FDIC") liquidated its loan portfolio, which contained many non-performing commercial real estate loans such as the ML Loan.  In August 1997 the FDIC notified potential bidders that it was selling certain pools of non-performing loans.  It

---

[2]Docket No. 524.

[3]The following facts are undisputed unless otherwise noted.  Rev 973 does not dispute any of the thirty-six facts set forth in the Estate's Statement of Uncontroverted Facts.  Rev 973 did assert fifty-eight facts that it claims *are* in genuine dispute.  On its reply, the Estate contested certain, but not all, of Rev 973's assertions as to facts being in dispute.

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

offered the ML Loan for sale as part of FDIC loan pool I9721. SUF ¶¶ 3-4. At the time the FDIC sold the ML Loan, no payments had been made on it for nearly six years. Estate's Appendix, Ex. 6, Fine Dep. 559:5-13.

Revere Financial Corporation ("Revere") was one potential bidder. Revere's primary purpose was to acquire loans from the FDIC and assist the FDIC in the liquidation of these loans. Jerrold Fine was Revere's president, chairman of the board, and account manager. SUF ¶¶ 5-7.

The FDIC restricted the due diligence potential bidders could conduct. They could review, but not copy, the FDIC's file. They could view the real property security from the street, but not enter upon the properties.[4]

The loans could only be purchased within a loan pool; buyers could not pick and choose the loans they wished to bid on. Also, the FDIC also set a minimum bid. In the case of Loan Pool I9721, the minimum bid was 73 percent of the book value (the total amount owing on the loans in the package), $1,812,697. Estate's Appendix, Ex. 5 at REV 008055. Statement of Genuine Issues ("SGI") ¶¶ 45-46.

After Fine received notice of the upcoming sale in August 1997, he reviewed the FDIC's file on the Loan Pool I9721 over the course of four visits to the FDIC's Irvine Office. From the file, as Fine acknowledged at his deposition, it was apparent that the ML Site suffered from environmental contamination. The file contained a Phase II Environmental Site Assessment Report that detailed the existence and scope of the total recoverable petroleum hydrocarbons, volatile organic compounds, lead, benzene, and PCB contamination of the property's oil and groundwater. That report also described remediation alternatives, estimating that it would cost around $825,000 to $2,145,000. At his deposition, Fine recalled that the reports in the file estimated cleanup costs at between $1 million and $1.5 million, and that elsewhere in the file there was a $2.4

---

[4]Although Rev 973's counsel failed to provide citations to evidence, these features of the bidding process are partially corroborated by the FDIC's Notice of Sale (Exhibit 5 of the Estate's evidentiary appendix). The FDIC's Notice of Sale says the due diligence period is August 4 to August 28, and due diligence "will be conducted at the FDIC office" in Irvine at designated "viewing hours."

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|----------|----------------------|------|----------------|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

million estimate.  SUF ¶¶ 8-13, 19.

Before he placed the bid, Fine mapped out various financial scenarios in a "Bid Spreadsheet" for each piece of real property security in the loan pool.  (Estate's Appendix, Ex. 11.)  SUF ¶¶ 14-15.  At his deposition, he explained the meaning of each column on the spreadsheet and of the numbers he had entered.  One of the scenarios reflected on the Bid Spreadsheet was the "Worst Case Scenario," where Revere would have to sue for judicial foreclosure on the real property security and sell it.  According to Fine, this was the last resort if Revere could not collect the debt through other means. (See citations to deposition testimony at Reply at 4-6.)

Fine did not expect the worst case scenario to come to pass.  He had predicted that the debtors, John and Mireille Mouren-Laurens, would pay their debt if Revere reduced the payments and otherwise modified the terms of the loan, especially after Revere threatened to sue for foreclosure.  Although he didn't expect to actually have to go through with foreclosure, he testified, "for bidding purposes only, we have to assume the worst case scenario.  It's not a strategy, it's not a rule.  It's only a guide for making your bid."  Estate Appendix, Ex. 6, Fine Dep. 555:20-23.  Although he knew that the Mouren-Laurens had not made payments for nearly six years, he nevertheless considered foreclosure a worst case scenario.  Fine Dep. 559:5-12.

Even under the Worst Case Scenario, Fine estimated that net proceeds from selling the property would be $635,000.  To arrive at the $635,000, he assumed that the property would be worth $2 million if it were clean. $2 million was Fine's estimate, based in part on a $1.4 million appraisal of the property in 1994 that was in the FDIC file.  Reply at 5 n. 6.  He then subtracted from the value of the property amounts for delinquent property taxes, legal fees associated with the sale, closing costs and broker's commission, and $1.1 million in "deferred maintenance." Then, he took 55 percent of the anticipated net proceeds to arrive at a bid amount of $348,400 for the ML Loan.  Reply at 4-6.

At his deposition, Fine described why he entered zero into one column on his bid spreadsheet labeled "To Cure."  That entry represented his assumption that he would not have to spend any money to cure the environmental problems.  Fine Dep. 569:2-6 ("I have zero, because we didn't think we were going to be foreclosing on the property, and (2) as a lender, I didn't believe we were liable to clean up the property under the law.").

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

Nevertheless, he deducted $1.1 million from his estimated value of the property for "deferred maintenance."  When asked how he came up with $1.1 million, he testified: "Somewhere in one of the reports someone said between a million and a million and a half.  Someone else said 2.4.  My - - my sense was I was trying to reach for a number that would depreciate the value of the building to give me a guide on how much I should bid. . . ." Fine Dep. 569:13-18.

On September 5, 1997, the FDIC notified Revere that it had submitted the winning bid on Loan Pool I9721 -- $1,848,267, which was 74.420 percent of book value.  SUF ¶ 21; SGI ¶ 47.  Of the price Revere paid for the entire loan pool, $348,400 represented the price paid for the ML Loan.  Reply at 3.  At the time Revere acquired the loan pool, the total amount due on the ML Loan was $670,306.

On September 18, 1997, Revere and the FDIC completed the sale of Loan Pool I9721.  In signing the Loan Sale Agreement, Fine acknowledged that the FDIC informed him that the real property standing as security for certain loans in the loan package was or might be environmentally contaminated, and that such contamination could negatively affect the value of the property.  SUF ¶ 24.  This was not unusual.  Nearly all of the real properties that secured the loans the FDIC was selling had environmental impacts, according to the FDIC's Notice of Sale and the sale documents for the loan pool that Revere bought.  Fine Decl. ¶ 37(b); Estate's Appendix, Exs. 5, 12.

**B.      Events After Revere Acquired the Mouren-Laurens Loan**

Revere initiated a non-judicial foreclosure proceeding of the Mouren-Laurens Property on October 7, 1997.  SUF ¶ 27.  Soon after, Fine communicated with John Mouren Laurens's attorney, Leon Small, and acknowledged that there were environmental problems.  Fine told Small: "We [Revere] have no fear of litigation, nor taking possession of contaminated property. . . we are in possession of the reports provided by the FDIC that describe the problems, with estimates of the cost."  SUF ¶¶ 28-30.  Also in October, Fine and several partners formed Rev 973 for the purpose of acquiring the ML Loan from Revere.  SUF ¶ 31.  In December 1997, prior to the trustee's sale, John Mouren-Laurens's attorney notified Fine by letter that at least two regulatory directives or compliance orders had been issued for the property that required a complete environmental site assessment and that Fine could be named as a Potentially Responsible

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|----------|----------------------|------|----------------|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

Party for clean-up of the site.  The letter also reiterated what Fine apparently knew already, namely that one environmental proposal estimated the cost of environmental characterization and remediation to be in the range of $1 million.  SUF ¶ 33.

A Trustee's Sale of the ML Property was held on January 8, 1998.  Rev 973 was the sole bidder and thus acquired the property.  The Trustee's Deed Upon Sale was recorded on February 10, 1998.  SUF ¶¶ 34-35.

The Estate and Rev 973 dispute how much effort Fine put into collecting on the loan.  According to Fine, after Revere acquired the ML Loan, it sought to collect on the loan by modifying the loan in various ways, but, being unsuccessful, it was "forced" to initiate foreclosure proceedings.  Declaration of Jerrold A. Fine ("Fine Decl.") ¶ 16.  Since the Mouren-Laurens Oil Company was still doing business on the property, Revere and Rev 973 expected the borrowers to pay something to retain ownership of the site rather than lose it through foreclosure. *Id.*  As Fine explains it, the reason he expressed to the Mouren-Laurenses that he had "no fear of litigation, or of taking possession of contaminated property" was that a representative of the Mouren-Laurenses supposedly had tried to use the threat of environmental liability to get Revere to waive the debt.

For its part, the Estate contends that Revere rushed into foreclosure after it acquired the loan and did not actually offer any modified repayment terms.  It contends that Fine knew he would make a nice profit even with foreclosure and that he never expected to pay the clean up cost.  Moreover, the Estate asserts, Fine could have sued on the promissory note or Deed of Trust.  In essence, the Estate's position is that Fine chose foreclosure over other options, whereas Fine maintains he was "forced" to foreclose.

As the parties are well aware, discovery into contamination and clean-up costs has been complicated and demanding, and it is ongoing.  The parties also agree that the clean-up costs exceed the amounts estimated in the FDIC file.  Rev 973's expert, Joseph Derhake, estimates that it will cost at least $30 million to clean up the site.  In its reply, the Estate does not dispute this estimate.

## III.   LEGAL STANDARDS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | | Date | April 22, 2009 |
|---|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | | |

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A fact is material if it could affect the outcome of the suit under the governing substantive law.  Id. at 248.  The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party.  The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325.  Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'"  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citing *Celotex*, 477 U.S. at 322).

When the moving party meets its burden, the "opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Summary judgment will be entered against the opposing party if that party does not present such specific facts. *Id.*  Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.*; *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255).  But the non-moving party must come forward with more than "the mere existence of a

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

scintilla of evidence." *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Simply because the facts are undisputed does not make summary judgment appropriate. Instead, where divergent ultimate inferences may reasonably be drawn from the undisputed facts, summary judgment is improper. *Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985).

## IV.    DISCUSSION

The Estate argues Rev 973 acquired the property through foreclosure with knowledge of contamination and after taking remediation costs into account in coming up with its bid. Thus, it contends, Rev 973 should be considered to have consented to the contamination under *Beck Development Co. v. Southern Pacific Transportation Co.*, 44 Cal.App.4th 1160 (Cal. Ct. App. 1996) and other cases that deal with what is referred to as the "consent defense" to nuisance liability for environmental contamination. Rev 983 argues it did not consent because it did not voluntarily purchase the property, but was instead "forced" to foreclose on the property to collect on the loan. It also argues that the federal method for getting rid of the nonperforming loans of failed financial institutions would be disrupted if foreclosing lenders could be found to have consented to contamination, since lenders would not bid on loans if they knew they could not recover damages from former property owners who contaminated the property. Thus, Rev 973 contends, the consent doctrine should be construed to not apply at all to foreclosing lenders. Moreover, it continues, even if California law would impose liability, then various federal laws and doctrines preempt would preempt California law.

### A.    Nuisance and Trespass Law As Applied to a Lawsuit Between Successive Owners or Lessees of the Same Property

This motion turns on the applicability of three California Court of Appeal cases cited by the Estate: *Beck Development*, on which the Estate relies most heavily, and two cases preceding it, *Mangini* and *Newhall*.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

> 1. *Mangini* established that a subsequent owner may bring a nuisance claim against a former lessee for contamination, but the lessee has a defense that the former owner consented to the contamination.

    *Mangini v. Aerojet-General Corp.*, 230 Cal.App.3d 1125 (Cal. Ct. App. 1991), *superseded on other grounds*, 12 Cal.4th 1087 (Cal. 1996), was the first California decision to allow a private suit for nuisance between parties with successive interests in the same property.  In *Mangini*, the plaintiff-current owner had been compelled by a regulatory agency to undertake testing of the property and abate the dangers condition caused by the contamination of her property.  The plaintiff was unaware of the contamination at the time she purchased the property from the former owners.  She sued the former lessee of the property for causing the contamination.  *Id.* at 1131.  On the lessee's (Aerojet-General's) demurrer, the California Court of Appeal of the Third District held that plaintiff may sue a former lessee for nuisance because "[t]he statutory definition of nuisance appears broad enough to encompass almost every conceivable type of interference with the enjoyment or use of land or property."  *Id.* at 1136 (quotation marks and citation omitted).  Regardless who currently possessed an interest in the property and when the nuisance was created, those who create and those who maintain a nuisance may both be held responsible for the ensuing damages.  *Id.* at 1137.

    Nonetheless, the Third District sustained Aerojet-General's demurrer, because it held that the former lessee had a defense that its disposal of the waste was done lawfully and pursuant to the authority of the lease.  The court stated that "where. . . an owner of property seeks damages for creation of a nuisance by a prior lessee, the lessee has a defense that his use of the property was lawful and was authorized by the lease, *i.e.*, his use of the property was undertaken with the *consent* of the owner."  *Id.* at 1138 (emphasis in original).  The court cited the Restatement Second of Torts for the proposition that lack of consent is an element of nuisance liability.  It further noted that "consent as a defense is necessary to avoid absurd results."  *Id.*  For example, "it would be absurd to allow the property owner to sue his lessee for having created a hole during the operation of a quarry when the owner leased the property for the purpose of operating a quarry."  *Id.* at 1139.  Because the original owner consented to that use, "he can clearly pass no right to sue to his grantee."  *Id.* (quotation marks and citation omitted).  Therefore, when an owner of property asserts a claim for damages against a former lessee, "the lessee must have a defense that his use of the property was lawfully undertaken pursuant to the consent of

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

the lessor." *Id.* at 1139-40.

> 2. The *Newhall* court stated that the plaintiff's knowledge of the contamination is relevant, but it held that consent doctrine does not protect owner from liability to unknowing successors based on consenting to his own *unlawful* acts.

In *Newhall Land and Farming Company v. Superior Court of Fresno County*, 19 Cal.App.4th 334 (Cal. Ct. App. 1993), the Court of Appeal for the Fifth District affirmed and clarified *Mangini*. There, an owner of property sued the former owners for continuing nuisance and continuing trespass, alleging that defendants had not disclosed the contamination to plaintiff's predecessor purchasers and that there was no visible evidence of the contamination when plaintiff purchased the property. *Id.* at 340. In *dicta*, the court noted that the plaintiff's knowledge of the existence of contamination was relevant because the plaintiff could factor the damage into the terms of the purchase. In the case before it, defendants allegedly had not disclosed the contamination, and hence the effect of the contamination could not be considered when the purchase was negotiated. *Id.* at 344.

The court went on to hold that the defendants could not use the *Mangini* "consent defense" to defeat plaintiff's nuisance claim on the demurrer. *See id.* at 344-45. First, the court stated, *Mangini* requires that the initial polluter's conduct was lawful. In *Newhall*, plaintiff alleged that the former owners' conduct violated several California statutes. *Id.* at 345. Second, the court noted, the *Mangini* court considered only the conduct of a lessee that was authorized by the lease. Given that factual context, "it does not make sense to extend the application of this rule and find an owner can never be liable to a successor in interest for nuisance because the owner consented to his own use of the property." Hence, the court concluded, where the previous owners "consent[ed] to their own unlawful acts" but did not disclose the contamination to their grantees, the consent defense does not apply. *Id.*

> 3. *Beck Development* held that an intermediate purchaser who knew or should have known of contamination loses his right to sue the former owner and can pass no right to sue to his grantee.

---

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

The case on which the Estate relies most heavily is *Beck Development Co., Inc. v. Southern Pacific Transportation Company*, 44 Cal.App.4th 1160 (Cal. Ct. App. 1996), also from the Third District.  In this case, plaintiff purchased land that had been owned by Southern Pacific Transportation Company, which constructed a large, concrete oil reservoir on the property and stored a hazardous type of crude oil in the reservoir.  *Id.* at 1172-73.  Southern Pacific sold the land to John Hachman, who dismantled the reservoir and eventually buried the concrete used to construct it.  *Id.* at 1174.  Hachman later sold the land to the Kagehiros, who were aware of the old storage reservoir but had forgotten about it by the time they sold the land to plaintiff, the Beck Development Company.  *Id.* at 1174-75.

Beck Development sued the original polluter, Southern Pacific, for an injunction to compel it to remediate the contamination caused by the old oil reservoir, among other things.  The Court of Appeal held that "under the circumstances presented" plaintiff could not obtain such an injunction of a private nuisance.  It cited the "defense of consent" as set forth in *Mangini*.  Reviewing *Mangini*, the court noted that it had "presupposed that the defendant acted lawfully in conducting the consensual activities that gave rise to the claim of nuisance."  *Id.* at 1215.  In this case, the evidence did not support a finding that Southern Pacific acted unlawfully in its storage of crude oil in the reservoir.  *Id.*  With the lawfulness requirement satisfied, the court held that Southern Pacific was entitled to the "consent defense."  It reasoned:

> Southern Pacific conducted its activities on the property with the consent of the owner, itself, lawfully and in an open and notorious manner from 1926 to 1945.  It sold the property to John Hachman with the storage reservoir in open view and with his full knowledge of the past usage of the property.  Hachman acquired no right to sue Southern Pacific for private nusiance and could have passed no right to subsequent grantees, including Beck.

*Id.* at 1216 (citing *Mangini*, 230 Cal.App.3d at 1139).  Thus, the court relied on *Mangini* for the proposition that where a previous owner consented to what was a lawful use, it could not pass a right to sue to subsequent grantees.  In *Mangini* the contamination was caused by a lessee whose use was lawful and authorized under the lease, and in *Beck Development* the contamination was caused by the previous owner itself, whose use of the property was not unlawful at the time.  In both cases the court barred the nuisance

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

claim of an unknowing subsequent purchaser against the party that allegedly created the contamination.

### B.    *Mangini*, *Newhall*, and *Beck Development* Do Not Preclude Trespass and Nuisance Liability for the Estate

*Mangini*, *Newhall*, and *Beck Development* established limits on the liability of former owners or lessees of the land under nuisance law.  Notably, under the facts of *Beck Development*, full knowledge of contamination on the part of the initial purchaser constituted consent to the contamination.  In that respect, it is consistent with the Restatement Second of Torts, which cuts off the liability of a vendor or lessor of land for a danger of nuisance on the land once the vendee or lessee discovers the condition and has had reasonable opportunity to take precautions against it.  *See* Rest. 2d Torts §§ 373, 840A.  Section 840A states:

> (1) A vendor or lessor of land upon which there is a condition involving a nuisance for which he would be subject to liability if he continued in possession remains subject to liability for the continuation of the nuisance after he transfers the land.

> (2) If the vendor or lessor has created the condition or has actively concealed it from the vendee or lessee the liability stated in Subsection (1) continues until the vendee or lessee discovers the condition and has reasonable opportunity to abate it.  Otherwise the liability continues only until the vendee or lessee has had reasonable opportunity to discover the condition and abate it.

### B.    *Mangini* and *Beck Development* Do Not Preclude Trespass and Nuisance Liability for the Estate

Although some cases have termed consent a "defense," *Beck Development*, 44 Cal.App.4th at 1214; *Newhall*, 19 Cal. App.4th at 344, the Estate points out that consent is not an affirmative defense.  Rather, lack of consent is an element of the plaintiff's *prima facie* case for nuisance and trespass.  Rev 973 does not dispute this characterization.  Thus, the Estate's burden on this motion is to establish that Rev 973 cannot demonstrate, as an element of its *prima facie* case, that it did not consent to the contamination.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

In this motion, the Estate emphasizes that Fine accounted for the contamination in his calculation of the bid amount, took a calculated risk that he would acquire the property by foreclosure, and expected to shift to others the cost of cleanup and make "windfall" profits in the end.  The Estate relies on *Beck Development* and contends that it is analogous to Southern Pacific, the original owner who allegedly caused the contamination, and Rev 973 is analogous to John Hachman, the purchaser who had full knowledge of the oil reservoir on the property.  As explained below, the Estate has not shown that *Beck Development* should extend to this case.

> 1. The Estate fails to address the requirement that the previous owner's use be "lawful."

A prerequisite to the application of the mischaracterized "consent defense" is that the plaintiff cannot disprove that "the defendant acted lawfully in conducting the consensual activities that gave rise to the claim of nuisance."  *Beck Development*, 44 Cal.App.4th at 1215; see also Newhall, 19 Cal.App.4th at 345. In *Beck Development*, the court had already held that plaintiff had not met its burden of proving that Southern Pacific had violated the Water Code, the statute underlying its claims of nuisance per se and public nuisance.  Similarly, in *Newhall*, the court rejected defendants' assertion of consent in part because plaintiff had alleged that defendants violated California statutes, including the Water Code, in effect at the time they used the property.

Here, the Estate does not address the lawfulness requirement at all.  It focuses exclusively on consent.  Rev 973 has alleged that the Estate, as well as the other defendants, violated various federal and state statutes: the federal Oil Pollution Act, the federal Resource Conservation and Recovery Act, the California Health and Safety Code, and the California Water Code.  The Estate has ignored the allegations that the Mouren-Laurens Defendants, the "original" owners who operated an oil business on the site, violated these laws.  Its argument for summary judgment is, in essence, that when a purchaser has knowledge of contamination, he consents even to unlawful contamination.  None of the Estate's cases supports that proposition.

> 2. There is a genuine dispute over the extent of knowledge that Jerrold Fine had regarding the contamination and cost of remediation.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | | Date | April 22, 2009 |
|---|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | | |

*Beck Development* does not support inferring consent from knowledge unless the purchaser had "full knowledge" of the former owner's activities on the property. 44 Cal.App.4th at 1216. The Third District did not explain what it meant by "full knowledge." There was no indication that the Third District considered the scope or extent of the contamination at the time Hachman acquired the property. It noted only that Hachman fully knew that Southern Pacific maintained an oil reservoir on the property. *Id.* As the Estate argues, *Newhall* provides a rationale for treating knowledge as equivalent to consent: the purchaser would be able to factor the damage into the purchase price. Consistent with those cases, the Restatement Second of Torts states that when a subsequent purchaser has had a reasonable opportunity to take precautions against a condition that it knew or should have known about, then the liability of the previous owner ends. Thus, the Estate's factual argument turns on evidence of what Fine knew or should have known and whether Fine could have factored or did factor in the damage in his bid amount.

In its Statement of Undisputed Facts, the Estate described the contents of the FDIC due diligence file that disclosed the contamination and cited Fine's acknowledgment that he knew the site was contaminated. In particular, the Estate relies on the fact that the FDIC file contained, and Fine reviewed, the Phase II environmental assessment conducted by the MRM Group in 1996.[5] The objective and scope of the MRM Group's Phase II assessment was to "confirm and evaluate the nature and extent of previously identified soil contamination at the Property." SUF ¶ 11. The assessment concluded with remediation alternatives for TRPH-impacted soil, VOC-impacted soil, and VOC-impacted groundwater. *Id.* The Estate does not argue that the information concerning contamination in the FDIC's file was complete; it merely argues that Fine had read the materials in the file and knew there was contamination that would cost as much as $2.4 million (by Fine's recollection) to remediate.

In opposition to this motion, Fine stated in his declaration: "I was aware that the Mouren-Laurens Site suffered from environmental contamination, but did not know the

---

[5]Thus far, there has been one site assessment (by Ralph Stone & Company), followed by five separate subsurface investigations of the Site (two by MRM Group, and one each by Clayton Group Services, AEI Consultants, Inc., and Waterstone Environmental, Inc.). Declaration of Joseph P. Derhake ¶ 11.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

full scope or nature of that contamination." Fine Decl. ¶ 13. Rev 973 has offered corroborating evidence that the due diligence that potential bidders were allowed to conduct was extremely limited. Moreover, Joseph Derhake, Rev 973's environmental consultant, concluded in 2003 that it would cost $30 million to remediate the Site. Derhake based his opinion in part on the reports of the five subsurface investigations that had already taken place, including the MRM Group's Phase II investigation. Derhake's cost estimate was based on various factors summarized in ¶ 17 of his declaration, including data regarding contaminant levels gathered in previous investigations.

Again, the Estate does not assert that the information available at the time of Rev 973's bid was complete and accurate. Fine could not put a precise price tag on the cost of remediation and did not factor in clean-up cost, because he did not believe that Revere would be liable for clean-up. He took a calculated risk based on the information available at the time and he reduced his anticipated proceeds by $1.1 million, which would be at the low end of the remediation estimates in the FDIC file. In sum, a reasonable jury could conclude that Fine could not and did not have *full* knowledge of the contamination.

The court in *Beck Development* did not purport to articulate any principle that knowledge can be equated with consent in all circumstances. The court implied that the buyer who saw the oil reservoir could fully understand the danger and therefore there was no undisclosed danger. (Presumably, Hachman was able to inspect the property prior to purchase.) In this case, however, no one who knew the kind of business the Mouren-Lauren Defendants operated on the site could fully understand the extent of contamination it caused., given the limited opportunity for due diligence. Moreover, given the incomplete environmental assessment at the time, and the passage of time since the start of litigation, this case involves an enormous difference in the clean-up cost estimates at the time of the acquisition and at the time of this Court's decision. *Beck Development* did not involve such a scenario. Indeed, it seemed to rely more on the statute of limitations than on consent. 44 Cal.App.4th at 1216.

Finally, the fact that Rev 973 eventually acquired the property as a result of the FDIC's liquidation of nonperforming loans sets this case apart from the cases the Estate cites. Unlike in those cases, here the seller imposed a minimum purchase price of about $1.8 million. That minimum bid acted as a limitation on the extent to which bidders

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

could factor in contamination into the bid amount.  The 1996 MRM Phase II report in the file provided a high-end estimate of $2,145,000 for the cost of remediation.  The FDIC file indicated that the property had last been appraised in 1994 at $1.4 million.  In 1998 Fine chose to assume that the property was worth $2 million in his Bid Spreadsheet. Even if the remediation estimate were not factored into the total cost, the expected profit would have been small.  With these numbers, there was no way a bidder could fully take into account the full cost of remediation and still submit a realistic bid on the property. Hence, the windfall profit rationale that the Estate provides for the consent doctrine does not sensibly apply in this case.

In sum, *Beck Development* simply does not support equating the taking of a calculated risk in the purchase of loans in an FDIC sale with consent to contamination on the real property security.  The currently known scope of liability and extent of contamination far exceed the contamination a bidder at the FDIC sale reasonably could have discovered and the remediation costs that he could have priced into his bid.  Thus, the Court rejects the notion that Rev 973's knowledge allows the Estate to shift *all* of the nuisance liability to Rev 973.

The Estate has not met its burden of showing that the "consent defense" applies in this case.  Since the Court disposes of this motion on that ground,  the Court need not address the extent of either party's liability under nuisance law.[6]  Hence, the Court will not reach Rev 973's argument that the consent defense should never apply to foreclosing lenders and its argument concerning the preemptive effect of certain federal banking statutes and doctrines.  Rev 973's Rule 56(f) request for expert discovery regarding financial institutions is moot.

## V.    CONCLUSION

For the foregoing reasons, the Court DENIES the motion of Nicole Mouren-Laurens, on behalf of the Estate, for partial summary judgment on Rev 973's claims for continuing private nuisance, continuing public nuisance, and continuing trespass.

---

[6]The cases dealing with the "consent defense" do not provide guidance on the allocation of responsibility, but they do indicate that successive owners may share responsibility.  *See Mangini,* 230 Cal.App.3d at 1137.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 98-10690 AHM (Ex) | Date | April 22, 2009 |
|---|---|---|---|
| Title | REV 973 LLC v. JOHN MOUREN-LAURENS, *et al.* | | |

No hearing is necessary.  Fed. R. Civ. P. 78; L. R. 7-15.

_____ : _____

Initials of Preparer            SMO